Case number 22-5788, Jeff Rieck v. Housing Authority of Covington et al. Argument not to exceed 15 minutes per side. Mr. Torchia, you may proceed for the appellate. Good morning. I would like to reserve three minutes for rebuttal, please. May it please the court, my name is David Torchia. I'm here on behalf of Jeff Rieck, the plaintiff, and as the court knows, we're here this morning because the district court granted summary judgment on three of Mr. Rieck's claims and dismissed the final one. There were four claims. One was for First Amendment violation, the second was for breach of contract, the third was defamation, and the fourth was interference with Mr. Rieck's prospective employment. We will ask the court to reverse the district court's decision and remand for further proceedings, whatever those might be. We understand there are some issues that may remain in terms of immunity. I'm focusing my argument this morning on the First Amendment claim, but I certainly welcome any questions the court has on any of the others. On the First Amendment claim, the district court agreed that Mr. Rieck spoke about matters of public concern. That's the first element of the claim. And he did, there's no question about that. Mr. Rieck complained about illegal conduct by the board. There was an illegal appointment of a board member. In addition to that, Mr. Rieck complained about other conduct that was illegal in terms of being told not to fill units at a particular property and complaining about retaliation directed at him by Mayor Meyer, who also served as a board member and later the chair of the board. The district court, in terms of addressing whether Mr. Rieck, the second element, whether he spoke as an employee or a citizen, the district court said that Mr. Rieck spoke as an employee in terms of his allegation of the illegal appointment of Mr.  Because according to the court, what Mr. Rieck was trying to accomplish was to find out who Mr. Rieck was supposed to report to in terms of the board chair, whether it was Jennifer Allen or whether it was Mayor Meyer. I don't know where the court came up with that. That's not an argument that the defendants made. The court didn't cite anything in the record where Mr. Rieck said that in terms of the reason for his speech or the reason for his complaint about the illegal appointment. In fact, the record is very clear at the spot where Mr. Rieck made that complaint, that he was clearly complaining about Mr. Meyer and the city commissioners violating the law when they appointed Shawn Masters to the HAC board. And the violation was that under Kentucky law, only two members of the political party can serve on a housing board of directors. I'd like to step back and let you help me understand the framing of the retaliation claim. There are a lot of statements here and I'm struggling to determine whether the claim is related to the entirety of those statements or whether you are narrowing it down I think to the June 14 timeframe. Can you help me with what the particulars are? Yes, Judge. You're right. There were a lot of statements. They were explained much clearer in the district court where we addressed the matters of public concern, where we listed them all. But in short, there was the illegal appointment of Shawn Masters. There was an illegal request by Mayor Meyer to Mr. Rieck to stop filling units at a particular housing complex. This was a complex that the mayor wanted out of the city of Cummington. He wanted it over and done with. I understand that background, but I think my question is more honed on the particular retaliatory response because that's a group of claims related to public concerns and how the system is functioning. So what is it that, do you tie your retaliation claim to that June 14 series email or what? I'm sorry, Judge. Yes, we do. But there's also a retaliation that occurred before that in response to Mr. Rieck's speech. Earlier that year, in February and March of 2018, he spoke at board meetings where he related Mayor Meyer's comments about don't fill the units. He talked about the city reneging on a million dollar commitment to hack. After that, March 21 board meeting that you're talking about. OK, but when he's speaking at a board meeting, he's not speaking as a private citizen, right? I mean, he's speaking as the director of the housing department or whatever, right? At that point in time, he is the housing director, but the key thing is to look at the point of the speech. That's what, whether he's wearing his hat as an employee or not, the point, the Sixth Circuit says, look at the point of the speech. And the point of the speech is not to further his interests as an employee. He's not complaining about his own compensation and benefits or terms of employment. He's talking about protecting the rights of the citizens of Kentucky who are in these housing authority complexes. He wants to do what's best for them. This is not him complaining about his... He's not doing it. I mean, that's his job, though, too. I guess I'm having trouble separating. Is he clear at the meeting, like, OK, I'm not... This isn't the director's minute. I'm going to go speak in the public comment section of the meeting. And in the public comment section, I'm going to say, hey, this is a problem. This doesn't comport with our policy, you know, whatever it is. You're correct, Judge. He doesn't come out and say that during the course of the meeting. But that's... I was responding to Judge Strance's question about what retaliation followed. That's part of it. And then moving on to the June 14th email... Before you do that, I want to be sure that I'm clear on what is effectively a hostile work environment claim. That is what the March meeting, the accusations there are about aggressive activity. And that was where Meier, he reported Meier's harassment to the city director. But you are not raising an independent hostile work environment claim, correct? That's correct. This is all evidence of retaliation and the causal connection between the speech and eventually, in July, Mr. Reek's removal from his job. There's a pattern of protected conduct by Mr. Reek and there's a pattern of retaliation that culminates in July with the resolution giving the intent to terminate him. So you were moving toward the June 14th? Right. Are there particular statements in that email? Yes, Judge. That you rely on for the retaliatory claim? There are several, Judge. On the second page of the exhibit, 94-2, I'm at 1555 page ID. In about the top third, Mr. Reek, point blank, asks, will employee or other officer discipline be meted out publicly regarding you, the city commission, Williams, Downing, Wells, and Izinga, the city manager, and the city solicitor, for all failing to perform their jobs in a satisfactory manner and violating the law in violation of KRS 80.04? That's specific to the illegal appointment of Shawn Masters. In addition to that, there are other comments in here about, particularly on the next page, questioning whether under the mayor's leadership, anything positive or possibly even legal or non-discriminatory will happen. Those are comments that Judge Bertelsman looked at and determined to be kind of in his second category of protected speech being a matter of public concern. We listed in the district court several statements. Judge Bertelsman kind of put them in two separate buckets. These emails, though, they're from his official email address, right? They are. And they're to his board members, right? They're to his board. Interiors. I mean, it just looks like he's doing this all in a work context, not as like a private citizen. I understand. Besides Gmail address, it's not. I understand, Judge. Again, the question is all the circumstances and what's the point of the speech. Whether it came from his email, private email account, is not dispositive of the Sixth Circuit. It's not dispositive, but it's an addition of that, hey, maybe this guy is speaking out. He's talking about who he answers to. I mean, that's a question all of us have in our jobs, right? I mean, is this person a board member, not a board member, right? Well, that wasn't his question, Judge, who he answers to. That's what Judge Bertelsman said this was all about. The ultimate question in this context is, is this an ordinary part of Mr. Reek's duties? That's ultimately the question when you're looking at is he speaking as a citizen or is he speaking as an employee? And there's authority from the Sixth Circuit very clearly saying that when you're complaining, when you have to complain about a hostile environment or retaliation or illegal conduct directed at you by your supervisor, that's not part of your ordinary duties. It never should be an employee's ordinary duty to be subjected to this and have to complain about it. That's ultimately where we come out on this, particularly where the mayor is threatening him with hostile behavior, retaliating against him because of his speech. So if it's a harassment complaint that deals with him, how is that a matter of public concern? That concerns him, but it doesn't concern the public. Well, under the First Amendment, Judge, he has the right to petition for redress. And that's what he was doing when he complains to Jen Allen and he complains to other city officials. He has a right under the First Amendment to bring this to their attention about his own personal situation and the retaliation that he's suffering. Well, yeah, I don't, I mean, I think he does have that right. But I don't know, does that make it a matter of public concern? Every time somebody has a right to do something, then it's a public concern? Judge, there's a lot of authority in the circuit that says complaints about discrimination, complaints about illegal conduct are matters of public concern. I think that's right, but when it, I guess maybe I'm drawing a line that's too thin, but it's like, but if it's one person as opposed to, I'm complaining about this workplace, I'm complaining about something pervasive in the police department or whatever it is, as opposed to me specifically, I have a specific claim. I mean, I don't know whether that's a public concern, but, yeah. Thank you. You'll have your rebuttal time. Thank you. Good morning, Your Honors. Derek Wright, I'm counsel for the Housing Authority of Covington, as well as the board members who were individually sued, Joe Meyer, Jennifer Orrish, Jennifer Holt, and Sean Masters. There are a few different claims in the case. Most of the attention has been on the First Amendment, and most of the attention has been on the two issues that the district court ruled on. One is the citizen versus employee distinction, and the other is pickering balancing. We didn't even get there. I'll try to get there if we can, but I'll address the citizen employee distinction first, as well as this public concern issue. The court found that there were elements of public concern in the speech. We argued it was mixed. I didn't press that issue on appeal, because under Connick, the seminal Supreme Court case on there, it involved a questionnaire that they circulated. And there were, I think, 15 or 20 questions, and the court said most of these are not a public concern. It's just typical employee beef. But there is one question on there, I think it was question number 12, that talked about pressure to participate in campaigns or give support. And so just because there was one small thing in there that was a public concern, they went on ahead and went to the pickering side of it in that case. We didn't have the employee distinction in Garcetti. You don't dispute that there were matters of public concern? I don't dispute that, Your Honor, but I would caveat it this way. I don't think that they're all matters of public concern, as Mr. Torchia has said, and it kind of goes back to some of the questions. Some of them clearly are, aren't they? This is an organization that's there to assist people who need assistance in housing. And the response that he's gotten is that we're closing those houses. You're not to put any more people in that subsidized housing. I don't think there's any question on this record that there was a clear difference between the two parties in what was the purpose of this organization and how should that policy function, right? I would agree with that. I would agree that allegations, and the district court framed it in one of it, in the middle of its opinion, gave what they were. And to some of the questioning, it wasn't about harassment towards Mr. Reek, the typical employee beef with their supervisor. The way the district court framed it was comments about, are you being harassing towards the residents? Are you being hostile to public housing? That was more how the district court said that could be a public concern. Or the master's appointment, complying with law, that could be a public concern. My point on the public concern is when you look at the email, when you look at the board meeting minutes and the debate, those are little slices out of a very large controversy between them. And that factors into the pickering balancing and how much the speech substantially involved public concern versus how much of it was really an employee beef. To your point on don't fill the units, it's a little bit misconstrued. That comment allegedly happened in January of 2017 when Mr. Reek had hundreds of recordings, hundreds of hours of recordings. That remarkably was not recorded. In April of 2017, during a meeting to address the public, or I'm sorry, the City Heights Complex, he proposed an ordinance to, I believe it is quote, orderly phase it out. So this illegal directive is something that Mr. Reek said happened when they first met in 2017, but four months later the debate was orderly phase out. That email's in the record. It's very difficult to go back and forth on each item. I would agree with that because everyone, I mean, you can chart this out and we've got everyone's response and everyone's answer to that. But I think the gist of it is, is that there was an objection by Mr. Reek on matters of public concern about how this assisted or subsidized housing entity should work. I think if we can see that, then tell me why the actions that he suffered in response to that were not retaliation for defying the new mayor and chair of this board. I would funnel it to two things. One is the debate about the housing. He's construing it as you're being hostile to them, but as Mr. Meyer explained in his deposition, he felt the city of Covington had their disproportionate share. He wasn't getting rid of Covington housing or public housing. But that's once again, I'm sorry, that's the merits of the dispute. I mean, are you defending on the basis that these were not matters of public concern? No, I'm not. What I was getting at is the policy of whether to have more or less public housing is a policy debate. And as the executive director, he was the only employee that was directly accountable to the board. He was a policy advisor, a policy consultant. So are you saying he did not speak as a citizen? I mean, I'm not sure what you're getting at with your argument. That is what I'm getting at. He did not speak as a citizen. He spoke as a employee. And it kind of goes back to some of the questioning before. He hasn't really identified where this speech came from. It's, as best I can tell, he spoke in board meetings during a self-initiated executive director's minute. I believe there was some questioning about he didn't ask to speak as a citizen. And there are Sixth Circuit cases where I believe it was fire personnel would call council members from their home saying, I'm calling as a taxpayer. And I'm concerned about these budgets. And then you can see other cases. And I believe one was the city of Jellicoe versus Anderson that was just recently decided, where those same types of people, police, come to the council meeting. They're there attending in their capacity there to advise the council of their opinions on things, and that was employee speech. Whereas the fire person who's making the phone call, telling them they're a taxpayer, that is citizen. And the setting is important. I don't think any factors. Maybe the quicker way to get to this is to say that what I think you do in briefing is that you concede that much of the speech is on matters of public concern. So let's assume we're talking about a matter of public concern. What is your response to the claim that the actions and the ultimate termination of Mr. Rigg were not retaliatory? Well, they don't fit the citizen employee test. All of his speech at board meetings as executive director during his minute, which is all they've identified, is the setting, the impetus, the general context, all of those factors for the speech versus, citizen versus employee distinction, all point towards employee. So that's number one. And also the email is the other thing, which you've questioned about the June 14th email. That was from a work account, that was with the board of commissioners. All we have is the June email exchange and the board meetings, and those are all employee related. Then the second thing would be pickering balancing, which we didn't get into with Mr. Torchia's initial presentation. But all of those factors kind of point towards the employee, or the employer, I'm sorry, all the disruption. Read the minutes from the February and March meetings. It's full of negativity, this hostility, the toxic work environment. The staff have a letter that's in the minutes and they talk about the tension. There was the referral to Barb Carr, who was the HR director. She recommended bringing in a third party neutral to help mediate the differences between Mr. Reek and Mr. Meyer. I'm an employment lawyer, I don't know that I've ever gotten to a point where I've had to recommend that. That's all going to show the disharmony and the disruption in the workplace. He was coordinating one on one with his preferred board member, Jen Allen. But he would not interact with the rest of the board. He would tell her I'm missing a meeting, he wouldn't tell anybody else he was missing a meeting. He would talk to her about which minutes to put in a packet, but he wouldn't talk to anybody else about which minutes. Which is the basis that, based on his other activities or other failures, he would have been discharged without regard to the statements that he made? Well, that gets into the same outcome anyway defense, which the district court didn't rule on. The district court didn't get there because all of his speech, public concern is a separate element. Even if that's satisfied, you still have to look, is this citizen or employee in the district court? Very accurately said, this is all employee stuff in these emails and board meetings. And then after that, you have to go to Pickering Balancing. And there is a record replete of hostility and the lack of loyalty that some of the board members, particularly Joe Meyer, felt with this executive director. And the court didn't consider-  Okay, and I'm sorry, the district court didn't consider it, but there is also a presumption for policy making employees under the Rose-Stevens case, which would make speech on policy or political views. They can be terminated for that. So- Conclude. Very well, there may have been some items of public concern, but he definitely spoke as a citizen on the meeting and emails, and there was definitely a record of disruption in the agency. Thank you, Your Honor. May it please the court, counsel, my name is Cindy Effinger and I represent the estate of Stephen McMurtry. And we ask that this court affirm the district court orders dismissing the defamation and tortious interference claims, because truth is an absolute defense in both of those claims. And I want to be perfectly clear, Mr. Reek does not challenge the truthfulness of the statements that Mr. McMurtry made to the press.  Including that he was, that the board decided to terminate his employment for cause, that he received notice of that decision, and that the decision was for multiple reasons. But most importantly, that he had the right to a due process hearing to challenge the for cause determination. Because while he couldn't challenge the termination itself, he could challenge the for cause decision, because that would entitle him to a severance. He comes to this court, as he did the court below, and asks you to separate out a singular statement and identify that as defamatory or defamatory by implication. And as the district court recognized, the publication must be viewed as a whole. You cannot sever and you cannot isolate a single statement. Even though, given the admissions of the truthfulness of the article and the statements in the article, even that statement, in this case the dismissal was with cause, is truthful. And again, when you look at it as a whole, no other conclusion can be reached. Because as the district court recognized, the point of the analysis is what is the speaker trying to convey to the audience? And here the district court found that Mr. McMurtry was conveying what the board did and why the board did it. And that is a truthful statement. In the cases that we cited, the Western District case of Watts versus Lyon County Ambulance and the two Alabama cases. They talk about how a board decision to terminate for cause does not mean or imply that cause existed. And that an employee challenging cause cannot make defamatory the decision that was made to terminate for cause. Those cases- He did not, Mr. Rigg, did not undertake the hearing, right? He did not. In February of 2019, he waived his right and accepted the for cause termination, which is also an important point in determining, again, for the interference claim, which I'll get to, whether these statements were truthful or could properly be characterized as improper interference. But in this particular case, even if defamation by implication, as argued by Mr. Rigg, was a viable theory, he still has to view the statements as a whole. You cannot take out one singular statement. And even a defamation by implication, you have to acknowledge, or he has to acknowledge, the truthfulness of the statement that the board decided to terminate his employment for cause. So that is no different than this phrase, in this case, the dismissal was for cause. So the singular statement that he attributes to the defamatory act, he's already admitted, is truthful. And therefore, the district court was correct in dismissing his defamation claim. On the interference claim, the district court dismissed the claim on a motion to amend the complaint, because Mr. Rigg did not and could not plead sufficient facts to support the elements of the claim. And in fact, the singular paragraph in his amended complaint was nothing more than a formulaic recitation of some, but not all, of the elements of the claim of tortious interference. And the court dismissed it because those elements could not be proven. For example, Mr. McMurtry's statement to the press, or Mr. McMurtry, the element requires, the claim requires that a statement be made to a prospective employer, Mr. McMurtry made a statement to the press, not a prospective employer. Mr. Rigg could not also prove that the statement was made with the intent to interfere with a valid business expectancy, because there was no business expectancy, as the district court found, because this article was published the day or the day after the decision to terminate his employment. So there could be no valid business expectancy. Moreover, there's no improper interference. Well, I said earlier that truth is an absolute defense, and there is no defamation here. In Kentucky, the impropriety requires more than just the statements being made without justification, they must be made with some significantly wrongful act. And of all the list of things, the only one that applies is defamation. Mr. Rigg cites to an Ohio case that allows for exaggerated statements to be included in impropriety, but that is not the law in Kentucky. And I wanna wrap up by going back to the notion that he waived in February of 2019 his right to challenge the for-cause determination. So when he amended his complaint in November of 2019, nine months later, even if his argument had some merit that the statements were false, his concession and waiver of the right to challenge now makes that article, which is now being viewed months later, truthful. And he cannot challenge that. Thank you very much. Thank you. Mr. Torcic. Thank you. I'd like to start with some of the argument about the pickering balance. Because I didn't get there, and Mr. Wright did. I think at bottom there's a dispute of fact that needs to be addressed on a fully developed record about how the pickering balance comes out. They say Mr. Rigg was responsible for disruption. Mr. Rigg and others would say that the mayor, through his conduct and his belligerent activities at these meetings, was responsible for the disruption. Is that, I'm struggling with how we look at that, because the pickering balance is the legal test, right? Right. You may dispute a fact, which is clearly what's going on here. Here's what happened. One side says, here's why it happened. The other side says, no, here's why it happened. But the why is not the issue here, or the justification for how we came to these loggerheads. That's not the issue. The issue is what did coming to that position in balancing the impact of either the actions of the plaintiff or the defendant.  So I don't see that as causation. That's not a disputed issue. That's a determination of here's the event and what was the result of it. Is that incorrect? I don't necessarily disagree, Judge, but there are five factors in the pickering balance. And disruption is one of them. And there's others, there are four others that are balanced too, including was there disharmony among co-workers? Not at all. Did Mr. Reek's speech in and of itself- I thought there was a record of people resigning. No, not because of- Well, in the financial arm of this entity, they lost three or four out of a small group that were no longer there. And then you had the problems with hiring someone else to do it at a different wage structure. Judge, the departures happened a year before Mr. Reek was let go, and before all this speech came to a head. That was in the summer of 2017. That's when the people in the finance department left. And it wasn't because of anything that had anything to do with Mr. Reek's speech, which hadn't really happened much at that point in time. The turnover- Help me understand if it's disruption, if you have situations where the people involved will not get together and discuss it, or will not both appear at a meeting. I'm struggling with the outcome of this, and it seems like there is substantial disruption. Mr. Reek never refused to meet. If you're talking about the claim that Mr. Reek refused to meet with the mayor, that's- No, I think it was attendance at board meetings. He missed a board meeting because he was sick, and he missed a board meeting because he was on approved leave. None of those things were because of his speech. That's the issue. Are these factors to be balanced? Are they a result of the speech, not unrelated things? And I think that- I'm glad you raised that question because it gives me the chance to say that, that disruption has to be a result of the speech. In other words, the Bennett case. Somebody makes a slur in the office, and there's a huge amount of disruption. That's because of the speech that's allegedly protected. That's not what happened here. You can take a moment to conclude. Thank you. I will just conclude again by saying that we request that the court's decision, district court's decision be reversed and this matter be remanded in all respects. Thank you. You may call the next case.